UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT LEE

    *Plaintiff*,

    *v.*

GROCERY HAULERS INC.

    *Defendant*.

Civil No. 3:20cv523 (JBA)

March 11, 2022

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Lee brings this action against Defendant Grocery Haulers, Inc. ("GHI"), alleging that GHI "discriminated and retaliated against" him based on his race and caused him to detrimentally rely on its hiring misrepresentations. (Am. Compl. [Doc. # 19].) The Court previously dismissed Plaintiff's count for negligent misrepresentation [Doc. # 32]. GHI now moves for summary judgment on the two remaining counts: Count One, discrimination/retaliation and Count Three, promissory estoppel. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.) [Doc. # 54-2] at 1.) While Plaintiff contends that there are genuine disputes of material fact requiring trial, (Pl.'s Am. Mem. in Opp'n ("Pl.'s Opp'n") [Doc. # 71]), for the reasons that follow, the Court GRANTS Defendant's motion for summary judgment [Doc. # 54].

**I.   Background**

Plaintiff, an African American man, started working as a dispatcher for Defendant GHI in June of 2017. (Pl.'s Aff., Ex. A [Doc. # 67] ¶ 3.) Although Plaintiff's position was "at-will," (Offer Letter, Ex. B, DeMartino Aff. [Doc. # 54-11] at 2), he maintains that "during the orientation process" GHI's Director of Security Jim Mulcahey told him that he could not be fired without the implementation of "progressive disciplinary procedures," including verbal warnings, written warnings, and a performance improvement plan. (Pl.'s Aff. ¶¶ 21-24.) GHI

contends that Mr. Mulcahey only explained that GHI has a general policy of progressive discipline. (Def.'s Rule 56(a) Stmt. [Doc. # 54-1] ¶ 5.)

On July 15, 2018, Plaintiff had a disagreement with Richard Bocca, another dispatcher. (*See* Def.'s Rule 56(a) Stmt. ¶ 9.) Mr. Bocca contends that Plaintiff said he was going to "kick [Mr. Bocca's] ass," which Plaintiff denies. (Pl.'s Aff. ¶13.) Plaintiff claims that Mr. Bocca yelled and cursed at him. (*Id.*) Plaintiff gave a written statement on the incident to Mr. Mulcahey, in which he denied threatening Mr. Bocca and said that he was "irritated by Rich [Bocca] as he doesn't help me and talks behind my back." (Lee Handwritten Stmt., Ex. H, Mulcahey Aff. [Doc. # 54-21] at 3.) Plaintiff claims that he informed Mr. Mulcahey that "Mr. Bocca was making African American drivers drive longer and more strenuous routes," (Pl.'s Aff. ¶ 14), although this claim is not reflected in his written statement. (*See* Lee Handwritten Stmt. at 3.)

The turbulence between Plaintiff and Mr. Bocca continued throughout the month. Plaintiff asserts that on July 29, 2018, Mr. Bocca made a derogatory, racist remark, telling him that "you people are only good for working in the field." (Pl.'s Aff. ¶ 15.) The same night, Plaintiff called his supervisor, Tim Hagan, to request a meeting with Human Resources and texted Brian Bender, GHI's Vice President of Operations, that Mr. Bocca was "really aggressive." (Def.'s Rule 56(a) Stmt ¶¶ 10-12.) Plaintiff asserts that he reported Mr. Bocca's racially discriminatory statement and conduct to his superiors, (Pl.'s Aff. ¶ 17), but GHI denies that Plaintiff ever articulated to any manager that Mr. Bocca made such racially disparaging comments or engaged in discriminatory conduct. (Def.'s Rule 56(a) Stmt ¶¶ 10-12, 15.)

On July 31, 2018, Tim Hagan and Brian Bender reached out to Jay Sabin, GHI's General Counsel and Vice President of Human Resources, to discuss placing Plaintiff on an improvement plan because of his "performance issues." (Pl.'s Resp. ¶ 16; Bender Aff. [Doc. # 54-3] ¶2; Hagan Aff. [Doc. # 54-14] ¶¶ 2-3; Sabin Aff. [Doc. # 54-30] ¶ 2.) Then, on August 2,

2

2018, Plaintiff was called into a meeting with Mr. Sabin, Mr. Mulcahey, and Mr. Hagan. (Pl.'s Aff. ¶ 19.) The parties dispute the details of what transpired. Plaintiff states that he was fired and escorted from the premises before he had a chance to discuss Mr. Bocca's conduct. (*Id.* ¶¶ 18-19.) GHI states that Mr. Hagan started the meeting saying that they were "there to address [Plaintiff's] concerns," but that Plaintiff said "he saw where this is going," packed up, and left. (Def.'s Rule 56(a) Stmt ¶ 18.) On August 3, 2018, GHI processed Plaintiff's status change paperwork, reflecting that Plaintiff was "discharge[d]" for "performance," (Associate Status Change Notice, DeMartino Aff., Ex. D. [Doc. # 54-13]), and on August 6, 2018, Mr. Sabin issued a letter to Plaintiff, reflecting that Plaintiff had "ended the discussion [on August 2, 2018] after less than a minute and displayed no interest in understanding the Company's decision." (Sabin Letter, Ex. C [Doc. # 60] at 15.)

## II.     Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record, Fed. R. Civ. P. 56(c), but the "non-moving party may not rely on mere conclusory

allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Anthony v. GE Cap. Retail Bank*, 321 F. Supp. 3d 469, 474 (S.D.N.Y. 2017) ("A party's self-serving, uncorroborated, and conclusory allegations are not enough to raise a genuine dispute of material fact when documentary evidence clearly indicates the opposite.")).

### III. Discussion

#### A. Discrimination

Plaintiff charges that GHI "discriminated and retaliated against [him] in the terms and conditions of his employment by discharging [him] as a result of his race and color" in violation of Connecticut General Statute § 46a-58(a), §60(b)(1) and Title VII of the Civil Rights Act.[1] (Am. Compl. ¶ 13.) GHI argues that summary judgment must be granted in its favor because Plaintiff has not established a prima facie case of discrimination by either demonstrating an adverse employment action or raising an inference of discrimination. (Def.'s Mem. at 16-17.)

Courts utilize the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) to analyze claims of discriminatory treatment. This framework requires plaintiffs to establish a prima facie case by demonstrating that they (1) are part of a protected class; (2) are qualified for their position; (3) suffered an adverse employment action; and (4) suffered this adverse action under circumstances which give rise to an inference of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If a plaintiff establishes a prima facie case, which is "not onerous" *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir. 1997), the employer must "come forward with a legitimate, nondiscriminatory reason for the adverse employment action." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir.

---

[1] Claims under the Connecticut Fair Employment Practices Act are analyzed under the same principles as under Title VII. *See Kearney v. City of Bridgeport Police Dep't*, 573 F. Supp. 2d 562, 573 (D. Conn. 2008).

2012). If the employer offers such evidence, the plaintiff must then prove that "race was the real reason for the employer's adverse action." *Id.*

       1. *Adverse Employment Action*

GHI asserts that Plaintiff cannot demonstrate that he was subject to an adverse employment action because "he voluntarily resigned" when he walked into the August 2, 2018 meeting with Mr. Sabin, Mr. Hagan, and Mr. Mulcahey, said he "s[aw] where this [wa]s going," and announced that he was leaving. (Def.'s Mem. at 8; Dep. of Tim Hagan, Lyke Aff., Ex. C [Doc. # 54-36] at 15-18.) The same day, Plaintiff texted Mr. Hagan to request a "pink slip." (Text message, Hagan Aff., Ex. F [Doc. # 54-20). Corroborating its position that Plaintiff quit, GHI points to Plaintiff's application for early termination of his federal supervised release, in which Plaintiff represented that he left his position at GHI "in anticipation of his planned move to North Carolina." (Application, Lyke Aff., Ex. H [Doc. #54-41] at 2.) GHI argues that "Plaintiff followed a similar pattern of job abandonment in his employment" which he has claimed to have been terminated in the past to obtain unemployment compensation where, in reality, he has quit. (Def.'s Mem. at 10.)

As evidence of his termination, Plaintiff cites his status change paperwork, stating that he was "discharged" for "performance," (Status Change Paperwork, Ex. B [Doc. # 60] at 13), and Mr. Sabin's letter reflecting that Plaintiff ended their meeting "and displayed no interest in understanding the Company's decision," (Sabin Letter, Ex. C [Doc. # 60] at 15). GHI explains that his termination paperwork was processed in this manner because he "le[ft] work without permission." (Def.'s Mem. at 9.)[2] It further counters that the "Company's decision" referenced in Mr. Sabin's letter was not the decision to terminate Plaintiff, but to place him on a performance improvement plan. (*Id.* at 6.)

---

[2] GHI confirmed at oral argument that Plaintiff's decision to walk out of the meeting is the the "performance" that the paperwork references, although this does not appear in the summary judgment record.

5

"While a defendant's termination of an employee would constitute an 'adverse employment action,' a defendant's termination of an employee who has resigned does not." *Salen v. Blackburn Bldg. Servs., LLC*, No. 3:14-cv-0136, 2017 WL 71708, at * 15 (D. Conn. Jan. 6, 2017). The record leaves in some dispute whether Plaintiff was involuntarily discharged or quit. While GHI endeavors to explain away the inconsistences in Plaintiff's termination paperwork and Mr. Sabin's letter, a reasonable jury could disbelieve GHI's explanations and conclude that Plaintiff had been discharged. As such, summary judgment will not be granted on this basis.

### 2. Inference of Discrimination

GHI next argues that there is no evidence that an adverse action occurred under circumstances giving rise to an inference of discrimination. In response, Plaintiff claims four bases for an inference of discrimination: Mr. Bocca's derogatory statement to Plaintiff, Mr. Bocca's discriminatory conduct in driving assignments, GHI's disparate treatment of Mr. Bocca and Plaintiff, and GHI's deviation from its established personnel policies. (*See* Pl.'s Opp'n at 20-34.)

#### a. Statement of Richard Bocca

GHI contends that there can be no inference of discriminatory motivation "based on the supposed statements of a non-decision-maker [Mr. Bocca] that were never recorded or reported in any way." (Def.'s Mem. at 10 (citing *Howard v. City of N.Y.*, 602 F. App'x 545, 547 (2d Cir. 2015).) In *Howard v. City of New York*, the Second Circuit affirmed the district court's grant of summary judgment to the defendant employer on the plaintiff's race discrimination claim where the plaintiff principally relied upon two pieces of evidence to support an inference of intentional race discrimination: "a single racially motivated comment uttered by a non-decision maker and the fact that the decisionmaker is black and he is white." 602 F. App'x at 547-48. The court concluded that the non-decision maker's comment did not create a triable issue of racial discrimination because the speaker "had no decision-making

6

authority in terminating [plaintiff]'s permit [to teach tennis] and [plaintiff] proffered no evidence beyond mere speculation tying this statement to any decision maker." *Id.*

GHI argues that Mr. Bocca's alleged racist comment does not raise an inference of employer discrimination because no decisionmakers either made or knew of this statement. (Bender Aff. ¶ 5; Hagan Aff. ¶ 12; Sabin Aff. ¶ 6.) GHI relies on record evidence that fails to connect racist remarks to its decisionmakers. It highlights Mr. Hagan's memorandum written after speaking with Plaintiff on the date of the alleged racist remark, (Def.'s Mem. at 12), where Plaintiff recounted that Mr. Bocca came into his office, spoke in a manner "that intimidated" him, but gave no further specifics of the interaction. (Hagan Stmt., Ex. D, Hagan Aff. [Doc. # 54-18] at 2.) Next, GHI points to a text message that Plaintiff sent Mr. Bender, stating that Mr. Bocca came into Plaintiff's office and was "really aggressive." (Text message, Ex. B, Bender Aff. [Doc. # 54-5] at 2.) The text message also does not mention Mr. Bocca's racially disparaging remarks. (*See id.*) Further, GHI cites Plaintiff's equivocation in his deposition when asked if he communicated to Mr. Hagan or Mr. Bender that Mr. Bocca made racially disparaging remarks, and only said that Mr. Hagan and Mr. Bender "were aware" of the incident. (Pl.'s Dep., Ex. E, Lyke Aff. [Doc. # 54-38] at 146-47, 156, 164.) Finally, GHI cites a portion of the transcript from Plaintiff's Connecticut Commission on Human Rights and Opportunities ("CHRO") hearing, where Plaintiff stated he was waiting until the meeting with human resources before he would "get into all the particulars about everything" because he "had lost faith in . . . even going into all of these details" after he had "been complaining all this time and nothing . . . happen[ed]." (CHRO Hearing Excerpt, Ex. B [Doc. # 72-2] at 3.)

To support his claim that he communicated Mr. Bocca's racist remarks to his superiors, Plaintiff relies on two pieces of evidence: a paragraph of his affidavit and a portion of his deposition. In his affidavit, he states that he called Mr. Hagan on the night of the incident and "informed him of the incident and action of Mr. Bocca and requested a meeting with Human Resources to discuss the racial remarks and actions of Mr. Bocca."  (Pl.'s Aff., Ex.

7

A [Doc. # 67] at ¶ 17.) Plaintiff asserts that this statement, when read in conjunction with preceding paragraphs of his affidavit describing Mr. Bocca's statement, evidences that he communicated the substance of Mr. Bocca's racist comment. While Plaintiff's affidavit describes the circumstances of his phone call with Mr. Hagan, it does not constitute evidence that Plaintiff expressly informed his superiors of Mr. Bocca's actual shocking words and leaves to speculation that they were aware of the nature of Plaintiff's complaint. Plaintiff's deposition suffers from the same infirmity. He relies on pages 166-67 of his deposition which contained the following exchange:

> Q: . . . I'm asking what did you communicate to Mr. Hagan as being the issues or issues?
> A: Well, I made him aware of the issues that – you know, of what took place during the incidents with myself and Mr. Bocca. And I asked for the meeting with human resources based on those incidents that happened between myself and Mr. Bocca that Mr. Hagan was aware of. And prior to that meeting being taken place, I was terminated without that meeting with human resources.
> Q: What did you tell Mr. Hagan was the issue?
> A: I told him – we talked about the issues, the incidents that took place between myself and Mr. Bocca.
> Q: What was the incident that you told Mr. Hagan about?
> A: The incident in question that we were talking about today, about what he said –
> Q: The incident –
> A: – when he came – the incident when he came to the office, he was throwing things around, being – you know, about my people only being good for working in the fields, you know, about Mr. Bocca also changing people's driving records around that were of black or Latino descent . . . .

(Pl.'s Dep. [Doc. # 64] at 166:1-167:2.) Plaintiff also references pages 150-51 of his deposition, where he similarly states that he "told Mr. Hagan . . . that there was an issue." (Pl.'s Dep. [Doc. # 61] at 151:13-14.) This testimony does not show that Plaintiff explicitly

8

told Mr. Hagan the racist substance of Mr. Bocca's comment, referring to it obliquely as the "incident" or "issue."[3]

Next, Plaintiff argues that Mr. Bocca was himself a decisionmaker and GHI is liable for his discriminatory conduct. "Mr. Bocca admitted that as a supervisor he has participated in the discharge of employees including at least three other employees." (Pl.'s Opp'n at 29 (citing Bocca Dep. [Doc. # 61] at 20-21).)) Plaintiff also states that Mr. Bocca's email to his superiors informing them of his purported statement that he would "kick [Mr. Bocca's] ass" was the event that "initiated [his] discharge." (*Id.* (citing Bocca Email, Ex. E [Doc. # 60] at 19).) However, even if Mr. Bocca had been involved in the termination process of other employees, Plaintiff has not demonstrated that Mr. Bocca played a role in *his* termination. The fact that Mr. Bocca emailed Plaintiff's superiors regarding an alleged threat does not alter this conclusion—it does not provide evidence that Mr. Bocca was involved in any decision-making about Plaintiff.

Finally, Plaintiff argues that Mr. Bocca's comment supplies an inference of discrimination because of the "close temporal connection between the discriminatory actions and comments made by Mr. Bocca and the Plaintiff's discharge." (Pl.'s Opp'n at 29.) Plaintiff relies on retaliation caselaw that a "temporal connection" may be sufficient for a "reasonable jury to find causation." *See e.g.*, *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013). While in the context of a retaliation claim for protected activity, a close temporal connection between the individual's protected activity and adverse employment action could allow an inference of causation, that analysis is inapplicable in this case where Plaintiff's evidence does not support either knowledge by a decisionmaker nor racially discriminatory remarks by a decisionmaker related to Plaintiff's termination.

---

[3] Plaintiff also appears to rely on his report of Mr. Bocca's "racial conduct" to raise an inference of discrimination, citing the same deposition testimony. (*See* Pl.'s Opp'n at 27.) This evidence lacks probative force for the same reasons.

Although Mr. Bocca's alleged statement was undoubtably racially derogatory, there is no evidence that the statement had any relationship to the decision-making process regarding Mr. Lee. On this record, the Court concludes that Plaintiff has not carried his burden of raising an inference of discriminatory motivation based upon the words of Mr. Bocca. *See Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark.").

### b. Conduct of Richard Bocca

Plaintiff also relies on the conduct of Mr. Bocca to support an inference of discrimination. He asserts that, "Mr. Bocca targeted me, along with other African-American drivers, and changed said drivers' routes, sending these drivers, for more physically demanding routes and longer routes than they had driven prior to Mr. Bocca returning to employment," and states that he informed his superiors that "Mr. Bocca was making African American drivers drive longer and more strenuous routes." (Pl.'s Aff. ¶¶ 11, 14, 17.)

In his deposition, Plaintiff was asked to provide the names of drivers whose routes were changed by Mr. Bocca because of their race or ethnicity. (Pl.'s Dep. Ex. E, Lyke Aff. [Doc. # 54-38] at 177-178; 270-71.) Plaintiff could identify only one person, a Latino man named "Sergio." (*Id.* at 270:20-21.) Sergio Bran, however, has provided an affidavit stating that he has "never thought that Richard Bocca or any other Grocery Haulers dispatcher changed driver routes because of the drivers' race or color." (Bran Aff. [Doc. # 54-8] at 1.) Without evidence beyond his own uncorroborated statement that Mr. Bocca engaged in these practices, Plaintiff has not raised any inference of racial discrimination.

Plaintiff further represents that he informed Mr. Mulcahey of Mr. Bocca's practice of changing Black and Latino drivers' routes. (Pl.'s Dep., Ex. E, Lyke Aff. [Doc. # 54-38] at

10

173:12-22; Pl.'s Aff. ¶ 14.) "I provided James Mulcahey a written statement concerning the July 16, 2018 phone conversation with Richard Bocca. I also informed Mr. Mulcahey that Mr. Bocca was making African American drivers drive longer and more strenuous routes." (Pl.'s Aff. ¶ 14.) However, the written statement he refers to is silent on the issue of Mr. Bocca discriminatorily changing Black and Latino drivers' routes. (Lee Handwritten Stmt., Ex. H, Mulcahey Aff. [Doc. # 54-21] at 3 ("I was . . . irritated by Rich as he doesn't help me and talks behind my back. I've got nothing to prove and am not intimidated by Rich Boca [sic.]").) The record contains no contemporaneous evidence that supports his assertions that he reported this claim of Mr. Bocca's discriminatory conduct, and his uncorroborated allegations do not raise a genuine dispute of fact.[4] *See Anthony*, 321 F. Supp. 3d at 474.

       c.  *Disparate Treatment*

Plaintiff contends that "[m]aterial questions of fact exist in the instant case as to whether an inference of discrimination exists based on the Defendant's statements to the Plaintiff and treatment of a similarly situated non-black employee (Richard Bocca) more favorably than the Plaintiff." (Pl.'s Opp'n at 27.) He maintains that Mr. Bocca is a "similarly situated employee-since he was also a dispatcher." (*Id.* at 29-30.) Plaintiff argues that Mr. Bocca was treated more favorably than Plaintiff because he made racially disparaging remarks to Plaintiff and "was not disciplined or put on a performance improvement plan." (*Id.* at 30.) Further, Plaintiff asserts that he and Mr. Bocca were both accused of threatening conduct, but Plaintiff was the only one discharged or put on a performance improvement plan. (*Id.*)

---

[4] Plaintiff's affidavit also states that he reported the "racial remarks and action of Mr. Bocca" to Mr. Hagan. (Pl.'s Aff. ¶ 17.) To the extent that Plaintiff is claiming that he informed Mr. Hagan of Mr. Bocca's practice of changing Black and Latino drivers' routes, this claim is neither reflected in his text message to Mr. Bender nor Mr. Hagan's memorandum of their conversation. Further, while Plaintiff describes Mr. Bocca's practice of targeting "African-American and Hispanic drivers' routes" in his CHRO Affidavit, Plaintiff did not claim that he reported this conduct to Mr. Mulcahey. (CHRO Compl. [Doc. # 72-1] at 6-7).

"A plaintiff may raise such an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). A plaintiff and her comparator must be "similarly situated in all material respects." *Id.* (quoting *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir. 1997)). While what constitutes "all material respects" will vary, it "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40. As such, there must be an "objectively identifiable basis for comparability" and a plaintiff must demonstrate a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id.* While a jury generally decides whether two individuals are similarly situated, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

At oral argument, counsel agreed that Mr. Bocca and Mr. Lee were dispatchers with some of the same supervisory responsibilities. In Plaintiff's view, he was "accused of threatening conduct" and his employment was terminated while Mr. Bocca, who made racially disparaging remarks and engaged in discriminatory conduct, "was not disciplined or put on a performance improvement plan." (Pl.'s Opp'n at 30.) However, as discussed above, the record lacks competent evidence that Plaintiff reported Mr. Bocca's remark or that GHI knew Mr. Bocca had made these statements when Plaintiff's employment was terminated. In other words, if Mr. Bocca made this statement, the record is insufficient for a reasonable jury to conclude that GHI knew that Plaintiff and Mr. Bocca engaged in conduct of "comparable seriousness" but treated them differently. *See Wagner*, 973 F.3d at 164; *Harlen Associates*, 273 F.3d at 499 n.2.

12

Alternatively, Plaintiff asserts that both he and Mr. Bocca were accused of threatening conduct: Plaintiff was accused of having threatened to "kick [Mr. Bocca's] ass," (Lee Handwritten Stmt. at 3), while Plaintiff accuses Mr. Bocca of threatening that he would come to Plaintiff's office and "say what he wanted to [Plaintiff's] face." (Pl.'s Aff. ¶ 13.) These instances cannot be viewed as of "comparable seriousness." *See Graham*, 230 F.3d at 40. Plaintiff is accused of threatening to engage in a violent act, while Mr. Bocca is only accused of threatening to verbally confront Plaintiff in person. The record does not support Plaintiff's theory that Mr. Bocca and Plaintiff are "similarly situated in all material respects," and as such, Plaintiff cannot rely on disparate treatment to support an inference of discrimination.[5]

### d. Departure from Usual Employment Practices

Finally, Plaintiff contends that an inference of discrimination may be found in GHI's departure from its usual employment practices, i.e., the policy to issue verbal warnings, written warnings, and corrective action plans before firing employees. (Pl.'s Aff. ¶ 23-24.) GHI makes the somewhat unsatisfying distinction between a progressive disciplinary plan or policy, which it claims it did not have, and a practice of progressive discipline requiring "appropriate disciplinary mechanism for each situation," which it did have. (Def.'s Reply at 9 (citing Mulcahey Aff. [Doc. # 54-21] at ¶ 3).)

Plaintiff relies upon *Stern v. Trustees of Columbia Univ.*, 131 F.3d 313 (2d Cir. 1997), where the Second Circuit concluded that an inference of pretext could be drawn from the university's "deviat[ion] from its normal decision-making procedure" in its effort to hire a candidate that was either a woman or of Hispanic origin. *Id.* at 310-13. This inference was drawn from the university's initial "attempt to give the position summarily to a woman without following any of its usual procedures," the fact that the plaintiff was the only

---

[5] Plaintiff also contends that "material questions of fact also exist as to whether the Plaintiff was discriminatorily treated differently than other employees which would also be proof of an inference of discrimination." (Pl.'s Opp'n at 30.) Plaintiff, however, has not offered evidence of any such similarly situated employee.

13

candidate that was not "either female or Hispanic, or both," and the university's decision to offer the position to a male of Hispanic descent with "unusual rapidity." *Id.* The deviation, "in other words, strengthened other evidence that was already pointing in the direction of discrimination." *Riccobono v. Crew* No. 00-cv-5386(SLT)(MDG), 2010 WL 11602749, at * 10 (E.D.N.Y. Sept. 10, 2010). Here, unlike *Stern*, there is no other evidence that supports an inference of discrimination even if GHI bungled its procedure to implement a performance improvement plan for Plaintiff. This, without more, does not carry Plaintiff's burden, *see id.*, and summary judgment shall be entered in favor of GHI on Count One.

### B. Retaliation

Defendant views Plaintiff's Count One as not properly pleading a retaliation claim. While GHI acknowledges that the Amended Complaint claims that "Defendant has discriminated and retaliated against the Plaintiff," (Am. Compl. ¶ 13), it argues that Plaintiff alleges only that he was discriminatorily discharged "as a result of his race and color." (Def.'s Reply at 1-2.) Further, Defendant argues that Plaintiff never claimed retaliation before the CHRO and his CHRO Affidavit is devoid of allegations supporting a retaliation claim. (*Id.* at 2.)

Under § 704(a) of Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015). To establish a prima facie case of retaliation, a plaintiff must establish that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *White v. City of Middletown*, 45 F. Supp. 3d 195, 214 (D. Conn. 2014). A "protected activity" may include "informal protests of

discriminatory employment practices," such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000) ("An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.").

A plaintiff can bring a Title VII claim only after timely filing an administrative charge with the proper administrative agency. *Holtz v. Rockefeller Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001). Administrative exhaustion is a precondition to suit but is not a jurisdictional requirement, *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d Cir. 2015), and a federal court can hear a claim that was not raised before an administrative agency where the allegations are "sufficiently related" and the "conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge of discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (citations and quotations omitted).

While retaliation and discrimination claims are different theories of liability, the factual allegations in Plaintiff's CHRO claim arguably were sufficient to put the administrative agency on notice of a retaliation claim that is reasonably related to Plaintiff's discrimination claim. He alleges that Mr. Bocca made a derogatory racial remark, he informed Mr. Hagan of the "incident and actions of Mr. Bocca," and he was discharged. (CHRO Affidavit, [Doc. # 72-1] ¶¶ 12-14; Am. Compl. ¶¶ 9-11); *see Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70-71 (2d Cir. 2006) (concluding that "the allegations in [plaintiff]'s EEOC claim *are* sufficient to have put the EEOC on notice of a potential sex discrimination claim that is 'reasonably related' to her retaliation claim, even though on her EEOC Charge of Discrimination there was no check in the box marked "Sex").

Nevertheless, the record reflects no genuine factual dispute about whether Plaintiff engaged in "protected activity." While he maintains that he "report[ed] discriminatory conduct," (*see* Pl.'s Opp'n at 15, 18), as concluded above, the record lacks sufficient evidence that Plaintiff reported Mr. Bocca's race-based remarks or any discriminatory practices to Mr. Hagan or Mr. Mulcahey. *See supra* pp. 9-12. As Plaintiff has not demonstrated that he engaged in a "protected activity" leading to his discharge, his retaliation claim fails.

### C. Promissory Estoppel

In Count Three, Plaintiff alleges that he was injured as a result of his reliance on GHI's promise that he would not be discharged without the application of progressive disciplinary policy. (Am. Compl. ¶¶ 17-21.) GHI maintains that summary judgment should be granted in its favor for Plaintiff's promissory estoppel claim because there is no evidence of a definite promise, detrimental reliance, or a broken promise. (Def.'s Mem. at 17-18.)

"Under the law of contract, a promise is generally not enforceable unless it is supported by consideration." *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 213 (1987). But a plaintiff may bring a claim for promissory estoppel if there is "a clear and definite promise which a promisor could reasonably have expected to induce reliance." *Id.* To recover under promissory estoppel, a plaintiff must prove four elements: "1) the promisor made a clear and definite promise; 2) the promisee reasonably relied on the promise; 3) the promise induced the action taken by the promisee; and 4) injustice can be avoided only by enforcement of the promise." *Adair v. Pfizer, Inc.*, 245 F. Supp. 2d 437, 445 (D. Conn. 2003).

Plaintiff argues that his reliance on GHI's promise was in the form of forbearance, and based upon GHI's promise, he "left a prior employment position and accepted employment with the Defendant." (Pl.'s Aff. ¶ 26.) This is not what the undisputed record reflects, which shows that he was unemployed before beginning his employment with GHI.[6] (Employee Exit

---

[6] Plaintiff conceded as much at oral argument.

Letter, Lyke Aff. Ex. A [Doc. # 54-34] (Plaintiff's employment with American Industries was terminated on July 5, 2017); GHI Application, DeMartino Aff., Ex. A [Doc. #54-10] at 5 (Plaintiff signed his employment application with GHI on July 19, 2017).)

Plaintiff also claims forbearance because he "did not seek other employment positions or opportunities" during his GHI employment based upon GHI's promise. (Pl.'s Aff., Ex. A [Doc. # 60] ¶ 26.) In Plaintiff's deposition, he stated that he had other job opportunities at the time he accepted his position with GHI, but he could not recall any specific job offers that he passed up and had no ability to determine what other offers were outstanding when he accepted employment because it was impossible for him to access online application portals from several years ago. (Pl.'s Dep., Lyke Aff., Ex. E [Doc. # 54-38] at 29:10-30:18.) Without any evidence in the record that Plaintiff reasonably relied to his detriment on GHI's promise, his promissory estoppel claim fails. *See Curcio v. Hartford Fin. Servs. Grp.*, 472 F. Supp. 2d 239, 245 (D. Conn. 2007) ("'[F]orbearance from seeking job opportunities is not sufficient to show detrimental reliance for purposes of promissory estoppel' because it is too speculative to establish detriment" (quoting *Martin v. Dupont Flooring Sys., Inc.,* No. 01cv2189 (SRU), 2004 WL 726903, at *6 (D. Conn. Mar. 31, 2004) (citing, *inter alia, D'Ulisse–Cupo,* 520 A.2d at 223 n. 5), *aff'd* 125 F. App'x. 369 (2d Cir. 2005))).

At oral argument, Plaintiff asserted that he does not have a burden of showing induced forbearance to maintain a promissory estoppel claim. This understanding is discordant with the precedent Plaintiff himself cites. (*See* Pl.'s Opp'n at 34); *Stewart v. Cendant Mobility Services Corp.*, 267 Conn. 96, 104 (2003) ("[U]nder the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and *which does induce such action or forbearance* is binding if injustice can be avoided only by enforcement of the promise." (quoting Restatement (Second), Contracts § 90, p. 242 (1981) (emphasis added)); *Chotkowski v. State*, 240 Conn. 246, 268 (1997) ("Under our well-established law, any claim

of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; *and the other party must change its position in reliance on those facts, thereby incurring some injury*." (internal citations and quotations omitted) (emphasis added)). Plaintiff also curiously reasoned at oral argument that he could not demonstrate that he gave up opportunities which he never sought.[7] Without any demonstration of detrimental reliance, summary judgment will be granted in favor of GHI on Plaintiff's count for promissory estoppel.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. # 54] is GRANTED.

IT IS SO ORDERED.



Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 11th day of March 2022.

---

[7] He does not, however, offer evidence of jobs for which he was qualified and would have applied to if not for GHI's promise.